**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

WILLIAM E. WARD, JR.,

                             Plaintiff,                      No. 9:16-CV-1224
                                                              (FJS/CFH)

          v.

WILLIAM A. LEE, et al.,

                               Defendants.

---

**APPEARANCES:**                                **OF COUNSEL:**

William E. Ward, Jr.
99-B-1473
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, New York 12788
Plaintiff <u>pro se</u>

Attorney General for the                       KEITH J. STARLIN, ESQ.
   State of New York                          Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants Lee,
Webbe, Ferrier, and Colao

Office of the United States                  CHARLES E. ROBERTS, ESQ.
Attorney - Syracuse                        Assistant United States Attorney
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198
Attorney for Defendants United States
Army/F.B.I. Hazardous Device School

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff <u>pro se</u> William E. Ward, Jr. ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that Superintendent ("Supt.") William A. Lee, Deputy Superintendent of Programs ("DSP") Kenneth Colao, Captain ("Capt.") W. Webbe, and Lieutenant ("Lt.") J. Ferrier – who, at all relevant times, were employed at Eastern Correctional Facility ("Eastern") – violated his constitutional rights under the First Amendment.  <u>See</u> Dkt. No. 47 ("Am. Compl.").  Plaintiff also alleges a claim for injunctive relief pursuant to the Freedom of Information Act ("FOIA") against the United States Army/F.B.I. Hazardous Device School, Redstone Arsenal, Huntsville, Alabama ("Hazardous Device School").  <u>See id.</u>[2]  Presently pending before the Court are defendants' Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  Dkt. Nos. 75, 78.  Plaintiff opposed defendants' motions, and defendants filed replies.  Dkt. Nos. 85, 86, 88.  For the following reasons, it is recommended that defendants' motions be granted.

---

[1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

[2] Several of the claims plaintiff asserted in his amended complaint were dismissed including plaintiff's (1) section 1983 and <u>Bivens</u> claims for monetary damages against defendants in their official capacities; (2) constitutional claims based on defendants' violations of DOCCS directives; (3) First Amendment claims based on interference with his legal mail; (4) First Amendment access to the courts claims against Capt. Webbe and Lt. Ferrier; (5) Fourteenth Amendment equal protection claim; (6) Fourteenth Amendment due process claim; and (7) conspiracy.  <u>See</u> Dkt. No. 46.

2

## I. Background[3]

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party.  See subsection II.A infra.  Plaintiff alleges that on October 7, 2014, he submitted a FOIA request to the Hazardous Device School, requesting a copy of the "'Explosive Train Manual,['] or information relative to the operating procedure itself, used by [non-party state police officers], who were trained at the Hazardous Device School at Redstone Arsenal." Am. Compl. ¶ 28.  Plaintiff contends that "the explosive train, or squeeze shot, test was used to alleged disarm a pipe taken from [his] apartment in November of 1998."  Id.  Plaintiff posed four questions in his FOIA request:

> [(1)] Is it proper procedure to wrap detonation cord, blasting cap, and fuse, around a piece of pipe (that does not have any detonating mechanism attached to it or screw-on-end caps) to detonate it?
>
> [(2)] Does this explosive train procedure establish the identity and quantity of the alleged explosive filler used?
>
> [(3)] Are there other scientific procedures normally used to identify the contents of pipes that are suspected to be explosive?
>
> [(4)] Also, could you please provide me with information on any specialized entity of the government who could investigate my case for fraud on the part of officers associated with the Hazardous Device School located at your base?

Am. Compl. ¶ 28.  On October 27, 2014, Capt. Webbe received a copy of plaintiff's FOIA

---

[3] The undersigned reviewed and considered the documents provided to the Court pursuant to its October 4, 2017 Order to the extent that they are referenced by either party.  See Dkt. No. 69.

request from non-party Criminal Intelligence Coordinator at the Hazard Device School Richard Browning. Id. ¶ 31. Plaintiff was placed in the special housing unit ("SHU")[4] pending an investigation and/or disciplinary charges. Id. During the investigation, plaintiff informed non-party Sgt. Bay that he sought information pertaining to his underlying criminal conviction to "challenge the reliability and accuracy of [the eyewitnesses officers]'s findings with evidence that would hopefully contradict their trial testimony, from the very school they were trained in, which would provide newly discovered evidence of [his] actual innocence in the courts." Id. ¶ 35.

On October 29, 2014, Lt. Ferrier issued plaintiff a misbehavior report charging him with soliciting goods and services from a business without approval (103.20) and attempted possession of material that depicts the construction of an explosive device (117.10). Am. Compl. ¶ 36. On November 3, 2014, DSP Colao commenced a Tier III disciplinary hearing. Id. ¶ 41. Plaintiff "made very clear" that he submitted the FOIA request "to obtain information relevant to preparing post-conviction motions in the New York Judiciary courts, and the Federal Appeals Courts, to challenge his on-going confinement." Id. Plaintiff also explained to DSP Colao that the request related to his underlying criminal charges of Criminal Possession of a Dangerous Weapon in the First Degree in violation of New York Penal Law § 265.04, as the prosecution alleged that a piece of pipe recovered from plaintiff's apartment

---

[4] SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ." N.Y. Comp. Codes R. & Regs. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

was an unlawful pipe bomb. Id. Plaintiff also entered into evidence several other past FOIL and FOIA requests regarding the explosives-related charge without interference from prison officials, as well as a letter written nine months before Lt. Ferrier's misbehavior report addressed to the Director of the New York State Defenders Association in Albany, New York to obtain the address to the Hazardous Device School. Id. Plaintiff asserted that his FOIA request was "directly[ ] and indisputably" related to his criminal conviction, which rested "on the theory that a piece of pipe recovered from his apartment contained an explodable [sic] substance based on [New York State police officers'] observations of a small, white, dirty white, puff of smoke, somewhere in the vicinity of the pipe, while conducting the disputed explosive train/squeeze shot procedure." Id. ¶ 43.

On November 10, 2014, DSP Colao found plaintiff guilty of attempted possession of materials that depict the construction of an explosive device (117.10), and not guilty of solicitation of goods and services without approval (103.20). Am. Compl. ¶ 44. On November 17, 2014, plaintiff requested a discretionary review of the Tier III hearing, and Supt. Lee "reviewed the penalty imposed [by Hearing Officer Colao] and [found] it appropriate."[5] Id. ¶ 48. On December 5, 2014, plaintiff filed an appeal of the Tier III hearing disposition. Id. ¶ 49. On January 15, 2015, Acting Director of the Special Housing/Disciplinary Program D. Venettozzi reviewed and reversed DSP Colao's finding of guilt. Id. ¶ 51. Plaintiff was transferred from Eastern to Green Haven Correctional Facility sometime in late 2014/early 2015. See id. ¶ 54.

_____

[5] Plaintiff addressed his appeal to former Supt. Thomas Griffen. Am. Compl. ¶ 48. Supt. Lee replaced Supt. Griffen while plaintiff was confined in SHU. See id.

## B. DOCCS' Defendants Recitation of the Facts

In support of their Motion for Summary Judgment, the DOCCS defendants filed a Statement of Material Facts.[6]  On or about October 7, 2014, plaintiff sent a letter to "Redstone Arsenal" requesting information regarding the design and/or use of explosive devices.  Dkt. No. 78-1 ¶ 17.  On October 27, 2014, non-party Eastern Deputy Superintendent for Security ("DSS") Russo contacted Capt. Webbe regarding a telephone call from Richard Browning informing Eastern officials that plaintiff had requested material and/or information regarding explosives, including a manual on explosives.  Id. ¶ 18.  DSS Russo ordered Capt. Webbe to initiate an investigation into the matter and return Mr. Browning's call.  Id. ¶ 20.  Capt. Webbe returned Mr. Browning's telephone call, and Mr. Browning informed him that plaintiff's

---

[6]  Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R.  7.1(a)(3).

October 7, 2014 letter requested a copy of a manual on explosives, and information regarding the proper procedure to connect a detonation cord, blasting cap, and fuse to a pipe bomb to detonate it. Id. ¶ 21. The letter also requested other information regarding explosives and pipe bombs, and what procedures could be used to determine the type of explosive filler used in a pipe bomb. Id. Mr. Browning faxed Capt. Webbe a copy of plaintiff's October 7, 2014 letter for review. Id. ¶ 22. Capt. Webbe had not seen or read plaintiff's letter, or knew of its existence, prior to receiving it by fax on October 27, 2014. Id. ¶¶ 26, 27. Plaintiff's letter requested that Hazardous Device School provide him with a copy of the:

> "Explosive Train Manual used in disarming pipe bombs" or "information relative to the operating procedure" for disarming pipe bombs; information showing whether it is "proper procedure to wrap detonation cord, blasting cap, and fuse around a piece of pipe . . . to detonate it"; along with information on methods "used to identify the contents of pipes that are suspected to be explosive", and whether it is possible to identify the "explosive filler [that] was used in a pipe" by observing the color/type of smoke emanating from it upon detonation.

Dkt. No. 78-1 ¶ 29 (quoting Dkt. No. 78-13 at 4). Pursuant to the October 7, 2014 letter, Capt. Webbe believed that plaintiff was requesting or soliciting contraband within a correctional facility. Id. ¶ 30. Capt. Webbe informed Lt. Ferrier of plaintiff's October 7, 2014 letter and the conversation with Mr. Browning, and instructed him to investigate whether plaintiff had violated DOCCS policy. Id. ¶ 31. Capt. Webbe provided Lt. Ferrier with a copy of the October 7, 2014 letter. Id. ¶ 32. Lt. Ferrier had not seen or read plaintiff's letter, or knew of its existence, prior to October 27, 2014. Id. ¶¶ 35, 36. Lt. Ferrier and other non-party DOCCS officials investigated whether plaintiff violated DOCCS policy. Id. ¶ 44.

Pursuant to the results of the investigation, Lt. Ferrier issued plaintiff a misbehavior report charging him requesting or soliciting goods or services from a business or person without approval (103.20) and attempting to possess an explosive device or material which depicts or described the construction or use of an explosive device (117.10). Dkt. No. 78-1 ¶ 45. In the misbehavior report, Lt. Ferrier offered a general summary of plaintiff's October 7, 2014 letter, and did not characterize the report as directly quoting the letter. Id. ¶ 46. Instead, he annexed a copy of plaintiff's letter to the misbehavior report to ensure that it was available for review. Id. ¶ 48. Capt. Webbe did not order Lt. Ferrier to issue the misbehavior report, nor did he write, assist in writing, or edit any portion of the report. Id. ¶¶ 50, 51. Ensuring that inmates do not possess weapons or information that instruct them how to use or create weapons is part of the core mission at DOCCS, and is important to ensure DOCCS facilities are safe, secure, and orderly. Id. ¶ 62. An Inmate Misbehavior Report does not constitute a finding that the inmate violated DOCCS policy; instead, it represents a determination by a DOCCS employee that there is evidence that the inmate violated a DOCCS inmate rule, and should be referred to a hearing on whether the inmate did violate that particular rule. Id. ¶ 73. A non-party reviewing lieutenant signed off on Lt. Ferrier's October 28, 2014 misbehavior report. Id. ¶ 74.

On November 3 2014, DSP Colao commenced a Tier III hearing on the charges contained in the October 24, 2014 misbehavior report. Dkt. No. 78-1 ¶¶ 76-77. During the hearing, plaintiff testified that he understood that an inmates' attempt to obtain materials and/or information explosives was "really touchy stuff," and that "[he knew] it" and was "aware

8

of it." Id. ¶ 80.  On November 10, 2014, DSP Colao found plaintiff not guilty of violating

DOCCS inmate rule 103.20, and guilty of rule 117.10.  Id. ¶ 81.  On November 17, 2014,

plaintiff wrote to non-party Supt. Griffin to request a "Discretionary Review" of the hearing

disposition.  Id. ¶ 83.  Supt. Griffin preceded Supt. Lee as Superintendent at Eastern.  Id.

Pursuant to DOCCS policy, during a discretionary review, a superintendent reviews the

penalty imposed and determines whether such penalty is appropriate for the charge.  Id. ¶ 86.

A discretionary review is not a full appeal of the hearing or of the finding of guilty, but a request

that the superintendent exercise discretion to reduce the penalty imposed.  Id. ¶ 87.  Supt. Lee

reviewed the relevant documents, and determined that the penalty imposed at the November

2014 Tier III hearing was appropriate.  Id. ¶ 90.  Plaintiff appealed the November 2014 hearing

disposition to the Commissioner.  Id. ¶ 92.  Supt. Lee did not take part in the review or

determination of plaintiff's appeal to the Commissioner.  Id. ¶ 93.  On January 15, 2015, the

Acting Director of Special House/Inmate Disciplinary Programs reversed the November 2014

hearing disposition and ordered it expunged from plaintiff's record.  Id. ¶ 96.

On November 13, 2014, plaintiff filed a grievance in connection with this matter (ECF-

26171-15). Dkt. No. 78-1 ¶¶ 102, 103.  Plaintiff filed the grievance several days before Supt.

Lee began working at Eastern.  Id. ¶ 103.  The Eastern Inmate Grievance Resolution

Committee ("IGRC") initially declined to accept plaintiff's grievance as it appeared to dispute

the November 2014 hearing disposition and the handling of the October 2014 FOIL request

– i.e., non-grievable issues.  Id. ¶ 104.  Supt. Lee was not involved in the decision to reject the

filing of plaintiff's grievance.  Id. ¶ 106.  Plaintiff's grievance was accepted for filing on January

5, 2015, and characterized as alleging staff misconduct and/or harassment meant to annoy, intimidate, or harm an inmate. Id. ¶ 108. Supt. Lee conducted an investigation into plaintiff's grievance, determined that plaintiff's October 2014 FOIL request had not been interfered with, and plaintiff's request to reverse his hearing disposition was moot. Id. ¶¶ 112, 113. Moreover, plaintiff's request that staff not retaliate against him based on his crime was accepted to the extent that all staff are expected to act in accordance with applicable directives, rules, and regulations. Id. ¶ 115. By the time Supt. Lee issued his response on February 25, 2015, plaintiff had already been transferred to another correctional facility. Id. ¶ 117.

### C.  Federal Defendant's Recitation of the Facts

In support of their Motion for Summary Judgment, the Federal Bureau of Investigation ("FBI") filed a Statement of Material Facts. On June 9, 2014, plaintiff filed a FOIA request with the FBI seeking an "Explosive Train technical Manual" for pipe bombs from the Redstone Arsenal. Dkt. No. 75-9 ¶ 2. On September 18, 2014, the FBI informed plaintiff that it had conducted the search, but could not locate a technical manual for pipe bombs. Id. ¶ 3. On October 7, 2014, plaintiff appealed the FBI's response. Id. ¶ 4. On October 28, 2014, the FBI acknowledged receipt of plaintiff's appeal. Id. ¶ 5. On February 11, 2015, the FBI sent a formal response to plaintiff's appeal. Id. ¶ 6.

## II. DOCCS Defendants' Motion for Summary Judgment[7]

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party."  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact.  See id. "When no rational jury could find in favor of the non-moving party because the evidence to

---

[7] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. First Amendment

Plaintiff contends that Capt. Webbe, Lt. Ferrier, DSP Colao, and Supt. Lee retaliated against him for filing a FOIA request with the Hazardous Device School. See Am. Compl. ¶¶ 75, 87. Defendants argue that plaintiff cannot establish a prima facie cause of action for retaliation against any of the defendants. Dkt. No. 78-2 ("Def. Mem. of Law") at 4-12. The undersigned agrees. Courts are to "approach [First Amendment] retaliation claims by

prisoners 'with skepticism and particular care[.]'" See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)).  A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560)).  To demonstrate the adverse action element, a plaintiff must show that the defendant's "'retaliatory conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . . Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.'" Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93).  "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007).  If the plaintiff meets this burden, the defendants must show, by a preponderance of the

evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

### 1. Lt. Ferrier and Capt. Webbe

Assuming for the purpose of this motion that plaintiff's filing of a FOIA request constitutes protected conduct,[8] there is no indication in the record that Lt. Ferrier or Capt. Webbe took adverse action against plaintiff.  Plaintiff contends that Lt. Ferrier filed a false misbehavior report against him "alleging, without any substantial evidence, that [p]laintiff had attempted to possess 'material depicting the construction of an explosive device'" in violation of DOCCS policy.  Dkt. No. 85-5 ("Pl. Opp.") at 10.  "It is well settled that filing false or unfounded misbehavior charges against an inmate does not give rise to a per se constitutional violation actionable under section 1983." Burroughs v. Petrone, 138 F. Supp. 3d 182, 205 (N.D.N.Y. 2015) (quoting Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.") (internal quotation marks omitted); see Reed v. Doe No. 1, No.

---

[8] It is unclear whether an *inmate's* filing of a FOIA request constitutes protected conduct.  Plaintiff relies on McAvery v. Orange-Ulster BOCES for the proposition that a FOIA request constitutes protected conduct.  See Dkt. No. 85-5 at 9-10.  The McAvery Court assessed whether the plaintiff's filing of a Freedom of Information Law ("FOIL") request should be categorized under "public employee speech made pursuant to an employee's official job duties" — which is not protected by the First Amendment "even if it otherwise touches on a matter of public concern — or "citizen speech" not related to her role as a public employee. McAvery v. Orange-Ulster BOCES, 805 F. Supp. 2d 30, 39 (S.D.N.Y. 2011).  Here, plaintiff is incarcerated, and it is well-settled that inmates "may be required to tolerate more than public employees . . . [or average citizens]" before a defendant's conduct is considered retaliation. Dawes, 239 F.3d at 491. Thus, plaintiff's reliance on McAvery is misplaced, and the undersigned is unable to find case law suggesting that an inmate's FOIA filing constitutes protected conduct.

9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (citing <u>Boddie</u>,
105 F.3d at 862) ("[T]he mere allegation that a false misbehavior report has been issued to
an inmate, standing alone, does not rise to [a] level of constitutional significance."). However,
a plaintiff's allegation that a defendant issued a false misbehavior report in response to the
plaintiff's protected activity can support a claim of unlawful retaliation. <u>See</u> <u>Reed</u>, 2012 WL
4486086, at *5. The plaintiff bears the burden of establishing that "the protected conduct was
a substantial or motivating factor in the prison officials' decision to discipline the plaintiff."
<u>Gayle</u>, 313 F.3d at 682.

The record is clear that on October 7, 2014, plaintiff requested, in part, "a copy of the
'Explosive Train Manual' used in disarming pipe bombs . . . [o]r . . . information relative to the
operating procedure itself." Dkt. No. 78-13 at 4. On October 27, 2014, DSS Russo informed
Capt. Webbe that DOCCS personnel had been contacted by Mr. Browning at the Redstone
Arsenal concerning plaintiff's request for material and/or information on explosives. Dkt. No.
78-5 ("Webbe Decl.") ¶ 6. Capt. Webbe spoke with Mr. Browning, who voluntarily faxed him
a copy of plaintiff's FOIA request. <u>Id.</u> ¶ 7. Capt. Webbe instructed Lt. Ferrier to investigate
whether plaintiff had violated DOCCS inmate rules by requesting such material, and provided
Lt. Ferrier with a copy of the letter. <u>Id.</u> ¶ 11. Lt. Ferrier conducted the investigation regarding
plaintiff's October 7, 2014 letter, wherein he spoke with the non-party DOCCS personnel that
interviewed plaintiff, the personnel that searched his cell, and the relevant personnel to
determine whether plaintiff had obtained prior approval to request such material. Dkt. No. 78-
3 ("Ferrier Decl.") ¶ 10. Pursuant to that investigation, Lt. Ferrier issued plaintiff a misbehavior

15

report charging him with violating DOCCS inmate rules 103.20 (an inmate shall not request or solicit goods or services from any business or person who is not an immediate family member without approval) and 117.10 (an inmate shall not possess or attempt to possess an explosive device or material which depicts or describes the construction or use of an explosive device). Id. ¶ 11.

Aside from his conclusory allegations, plaintiff proffers no evidence that Lt. Ferrier or Capt. Webbe subjected him to "conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . ." Roseboro, 791 F. Supp. 2d at 366 (quoting Dawes, 239 F.3d at 292-93); see Pl. Opp. at 7 ("Corrections officer Lt. J. Ferrier . . . "had a 'chilling effect upon [plaintiff's] exercise of his First Amendment Rights,' when he filed a false misbehavior report against [p]laintiff on October 28, 2014, alleging, without any substantial evidence, that [p]laintiff had attempted to posses 'material depicting the construction of an explosive device' in violation of [DOCCS] Standards of Inmate Behavior."). There is no indication that Capt. Webbe, in directing Lt. Ferrier to investigate whether plaintiff violated DOCCS inmate rules, or Lt. Ferrier, in authoring the misbehavior report, were motivated by retaliatory intent. In fact, Capt. Webbe declared that he did not participate in the investigation into whether plaintiff violated DOCCS inmate rules, nor did he instruct Lt. Ferrier to issue the misbehavior report, and the record supports that contention. See Webbe Decl. ¶¶ 14, 34.

Moreover, plaintiff has failed to demonstrate that his FOIA request, in and of itself, was "a substantial or motivating factor in the prison officials' decision to discipline the plaintiff."

16

<u>Gayle</u>, 313 F.3d at 682.  Both Lt. Ferrier and Capt. Webbe declared that they did not have any "stake" in whether plaintiff made FOIL requests or filed appealed related to his 1999 criminal conviction, and plaintiff has not proffered evidence suggesting otherwise.  <u>See</u> Ferrier Decl. ¶ 36; Webbe Decl. ¶ 36.  Plaintiff has not set forth any plausible reason as to why Lt. Ferrier or Capt. Webbe would file a fabricated misbehavior report against him because he filed a FOIL request attempting to appeal his underlying criminal conviction, nor has he proffered evidence of statements made by Lt. Ferrier and Capt. Webbe revealing retaliatory motives. <u>See</u> <u>Harnage v. Brighthaupt</u>, 168 F. Supp. 3d 400, 414 (D. Conn. 2016) (granting the defendants' motion for summary judgment where the plaintiff failed to proffer evidence as to why the defendant corrections officer would file an allegedly false misbehavior report against him); <u>see also</u> <u>Arce v. Walker</u>, 58 F. Supp. 2d 39, 46 (W.D.N.Y.1999) ("There is no evidence to support [plaintiff's] bald conclusion that the actions at Attica were retaliatory. [Plaintiff] does not allege that anyone made any statements to him or that he overhead any comments or observed any acts that suggested an improper motive.").

In opposition, plaintiff offers a series of arguments attempting to establish defendants' retaliatory motives.  First, plaintiff seems to suggest that Lt. Ferrier could not have charged him with violating Rule 117.10 because the FBI determined no such manual existed. <u>See</u> Dkt. Nos. 85-2 ¶ 66; 86-3 ¶ 5.  The undersigned notes that plaintiff's October 7, 2014 letter requests "a copy of the 'Explosive Train Manual' used in disarming pipe bombs . . . *[o]r . . . information relative to the operating procedure itself*." Dkt. No. 78-13 at 4 (emphasis added). The text of plaintiff's letter demonstrates that, in the alternative to the manual, he also

requested information regarding the procedure of disarming a pipe bomb, including whether it was "proper procedure to wrap detonation cord, blasting cap, and fuse around a piece of pipe . . . to detonate it[.]" Id.  Thus, whether the manual exists is immaterial to Lt. Ferrier's misbehavior report as plaintiff also requested information in addition to the manual.  Moreover, as discussed supra, DOCCS "Standards of Inmate Behavior" Handbook treats "an inmate's attempt to obtain materials/information barred by DOCCS inmate rule 117.10 [as] a violation of said inmate rule."  Ferrier Decl. ¶ 16.  Therefore, plaintiff's argument to the contrary is misplaced.  Second, plaintiff claims that he could have only been charged and/or found guilty of violating Rule 117.10 if he had intended to construct an explosive device.  See Dkt. No. 85-3 ¶¶ 11-13.  As defendants point out, the plain language of Rule 117.10 does not mandate an intent element, and plaintiff's motivation in seeking such material and/or information, absent prior approval from the Superintendent, is not relevant to this analysis.  See Dkt. No. 88 at 7 (citing Dkt. No. 78-17 at 3).  "Although inferences must be drawn in favor of the non-moving party on a motion for summary judgment, 'the non-moving party may not rely on conclusory allegations or unsubstantiated speculation.'"  Simmons v. Adamy, 987 F. Supp. 2d 302, 307 (W.D.N.Y. 2013) (quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)).  Thus, plaintiff has failed to demonstrate a prima facie cause of action for retaliation.

Even assuming plaintiff had established a proper retaliation claim, defendants have demonstrated that they would have issued plaintiff the misbehavior report even in the absence of the protected conduct.  See Mount Healthy, 429 U.S. at 287.  "'Once the burden shifts to the defendants, [plaintiff's] presentation creates a triable issue of fact unless the defendants

proffer an alternative basis for disciplining [plaintiff] that would apply to him even if his version of events were true.'" Harnage, 168 F. Supp. 3d at 415 (quoting Graham v. Henderson, 89 F.3d 75, 81 (2d Cir. 1996)). "'[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage.'" Harnage, 168 F. Supp. 2d at 415 (quoting Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994)).

Defendants have proffered relevant portions of the DOCCS "Standards of Inmate Behavior" Handbook, which designates prohibited behavior in all DOCCS facilities. See Dkt. No. 78-17 at 1-3. Rule 103.20 states that "[a]n inmate shall not request or solicit goods or services from any business or person other than an immediate family member without the consent and approval of the facility superintendent or designee." Ferrier Decl. ¶ 14. Rule 117.10 states that "[a]n inmate shall not cause or attempt to cause an explosion. The possession of an explosive device, material that can be used to make an explosive device, or material which depicts or describes the construction or use of an explosive device, is prohibited." Dkt. No. 78-17 at 3. The Handbook also affirms that "[t]he acts of conspiracy, attempt, and accessory will be punishable to the same degree as the actual offense involved." "Attempt" is defined as "[a]ny act which constitutes a step in a course of conduct which would result in an act of misbehavior." Id. at 2.

Lt. Ferrier declared that

> [b]ased upon [his] training and experience as a DOCCS officer,
> plaintiff's October 7, 2014 letter – and its request (to a business

19

> or person who was not a member of his immediate family) for
> materials concerning the disarming and detonation of explosives,
> and explosive materials used in pipe bombs and methods that
> can be used to identify said materials – appeared to violate
> DOCCS inmate rules 117.10 and 103.20.

Ferrier Decl. ¶ 17.  Plaintiff does not dispute sending the letter.  See generally Am. Compl.

Moreover, Lt. Ferrier declared that the material and/or information plaintiff sought "could well

pose a threat to the safety and security of the facility and those within it . . . [as] [s]uch

information could [ ] be used to make a pipe bomb that was especially difficult to disarm, or

make a pipe bomb specially rigged to explode[.]" Id. ¶ 24.  Thus, it is clear that, based on his

investigation and plaintiff's acknowledgment that he sent the October 7, 2014 letter, Lt. Ferrier

would have issued plaintiff the misbehavior report even if plaintiff had not used FOIA to

request such material, as plaintiff attempted to obtain material and/or information relating to

explosive devices in violation of DOCCS inmate rules, and such information and/or material

raised the possibility of a serious threat to the safety and security of the facility.  See O'Diah

v. Cully, No. 08-CV-941 (TJM/CFH), 2013 WL 1914434, at *11 (N.D.N.Y. May 8, 2013)

("Therefore, the [misbehavior] report would have been issued because of a rules violation,

even if O'Diah did not file a grievance.").

In opposition, plaintiff attempts to rebut defendants' contention that the October 7, 2014

letter posed a threat to the safety and security of the facility.  First, plaintiff argues that he

would have kept the requested material and/or information in a combination locked steel

locker, thereby, negating the threat of another inmate accessing the material.  See Dkt. No.

85-3 ¶ 31.  As defendants set forth in their reply, plaintiff's argument is belied by his

deposition testimony, where he stated that he did not keep his legal materials and other paperwork in a lock box; instead, he kept them "in the back of his cell" where another inmate could potentially access them. As to the safety of documents kept in his cell, plaintiff testified that "if somebody wanted to come in and rob [him] they could." Dkt. No. 88-2 at 9-10. Thus, plaintiff's argument is non-persuasive..

Second, plaintiff argues that non-party DOCCS Senior Investigator Douglas Holland determined that plaintiff's October 7, 2014 letter was not a threat to the safety and security of the facility, and that defendants had access to this determination prior to issuing the misbehavior report; thus, plaintiff suggests that defendants cannot claim they would have issued the misbehavior report absent a retaliatory motive. See Dkt. No. 85-3 ¶¶ 32-33. Plaintiff's argument is factually incorrect. The Court has in its possession two documents authored by Investigator Holland pursuant to the Court's October 4, 2017 Order. See Dkt. No. 69. The first document dated November 6, 2014 is a memorandum that details Investigator Holland's meeting with plaintiff, and intention to follow-up with the Albany Library regarding prior FOIL requests. Investigator Holland declared that the November 6, 2014 memorandum "was not meant to address the pre-existing charges already set forth in the October 28, 2014 misbehavior report, or as a commentary on them, but rather addressed the possibility of other charges that might potentially be pursued against [plaintiff]." Dkt. No. 78-4 ("Holland Decl.") ¶ 7. Moreover, Investigator Holland declared that he began his investigation surrounding the November 6, 2014 memorandum after Lt. Ferrier issued plaintiff the October 28, 2014 misbehavior report, and after his disciplinary hearing had commenced See id. The second

document is a Final Investigative Report dated October 4, 2016 – nearly two years after the underlying events of this case. See id.[9] This report "summarized the final results of [Investigator Holland's] investigation and whether additional charges and/or other action in regard to [plaintiff] were called for," and "did not deal with or address the propriety of any prior charges against plaintiff for violating DOCCS inmate rules." Id. Thus, plaintiff's argument that defendants should have known that plaintiff's October 7, 2014 letter was not a safety threat on or before October 28, 2014 is factually inaccurate.

Accordingly, as plaintiff has failed to demonstrate a prima facie case for retaliation against Lt. Ferrier and Capt. Webbe, it is recommended that defendants' motion be granted.

## 2. DSP Colao

Plaintiff alleges that DSP Colao "directly participated in the retaliation infraction by finding plaintiff guilty of the fabricated charge, 117.10, and subsequently sentencing [ ] plaintiff to 6-months in SHU" and one year recommended loss of good-time credit. Am. Compl. ¶ 101. The undersigned finds that plaintiff has failed to demonstrate why DSP Colao would find him guilty at a disciplinary hearing in retaliation for filing a FOIL request. See Harnage, 168 F. Supp. 3d at 414. Even assuming a reasonable fact finder could conclude that DSP Colao exhibited retaliatory animus in rendering the disciplinary disposition, the hearing transcript demonstrates that DSP Colao's determination was based on sufficient evidence from which DSP Colao could have found plaintiff guilty of attempted possession of material and/or

---

[9] Plaintiff improperly characterizes this report as dated October 29, 2014. See Dkt. No. 85-3 ¶¶ 32-33.

information that depicts or describes the construction of an explosive device.  See Waters v.
Prack, No. 9:13-CV-1437 (LEK/DEP), 2017 WL 1239642, at *8 (N.D.N.Y. Feb. 24, 2017)
(granting the defendants' motion for summary judgment where the defendant hearing officer's
guilty disposition was based on sufficient record evidence from which he "could have found
plaintiff guilty absent any retaliatory motive.").  Plaintiff admitted to sending the FOIL request
at issue in an attempt to appeal his 1999 criminal conviction, and that he did not seek
permission, or notify the Superintendent, prior to submitting that request.  See Dkt. No. 78-15
at 11, 13-14, 59.  Moreover, plaintiff acknowledged that "with 9/11 and the Boston [marathon]
bombings and stuff . . . [materials and/or information regarding explosives] is really touchy
stuff."  Id. at 15.  DSP Colao informed plaintiff that his request to obtain materials and/or
information regarding explosives was "a touchy subject even without 9/11 and the Boston
marathon explosion," wherein plaintiff stated, "I know it. I'm aware of it."  Id. Lt. Ferrier testified
that because the DOCCS Handbook states that "any attempt will carry the same penalty as
[ ] actual possession," it was his belief that plaintiff's "attempt to obtain material which depicts
explosive devices" violated Rule 117.10, as plaintiff's letter "describes specifically . . .
discussing wrapping fuses around blasting caps. He was asking questions pertaining to that,
and that's what led to the [misbehavior report]." Id. at 34.  Thus, the copy of the October 7,
2014 letter, plaintiff's commentary surrounding the letter, and Lt. Ferrier's testimony "provide
sufficient record evidence from which [DSP Colao] could have found plaintiff guilty absent any
retaliatory motive."  Waters, 2017 WL 1239642, at *8.  Moreover, there is evidence in the
record that DSP Colao would have imposed the same penalty – six months in SHU – against

23

any inmate found guilty of the same prison rule. <u>See</u> Dkt. No. 78-12 ("Colao Decl.") ¶ 48 ("I did not treat inmate Ward differently than I would have treated any other inmate in a similar situation."); <u>see also</u> <u>Graham</u>, 89 F.3d at 79 ("[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone."). Thus, it is recommended that defendants' Motion as to DSP Colao be granted.

### 3. Supt. Lee

Plaintiff contends that Supt. Lee, "in his supervisory capacity, [ ] deprived plaintiff of his constitutional rights . . . by not correcting his subordinates, and reversing [DSP] Colao's hearing disposition, once [plaintiff] made him aware that his officers were retaliating against him by filing frivolous misbehavior reports for his federally  protected right to request documents [through FOIA]." Am. Compl. ¶ 87. Defendants argue that Supt. Lee was not personally involved in any alleged violation of plaintiff's constitutional rights, and, to the extent that plaintiff's complaint is interpreted as alleging a surviving supervisory liability claim, such claim must be dismissed. <u>See</u> Def. Mem. of Law at 11, 12-14.

Supervisory officials may not be held liable merely because they held a position of authority. <u>See</u> <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994); <u>Black v. Coughlin</u>, 76 F.3d 72, 74 (2d Cir. 1996). However, a defendant may be considered "personally involved" if

> (1) the defendant participated directly in the alleged constitutional violation;
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

24

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[10]  Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact.  See, e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).  Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation.  Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).

The record demonstrates that Supt. Lee began working at Eastern on November 17, 2014 — after (1) plaintiff sent the October 7, 2014 letter; (2) the investigation into whether plaintiff violated DOCCS inmate rules; (3) the October 28, 2014 misbehavior report; and (4) the Tier III disciplinary hearing had concluded and a disposition had been rendered.  See Dkt. No. 78-6 ("Lee Decl.") ¶¶ 8, 9.  Thus, Supt. Lee could not have factually directly participated

---

[10] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

in the underlying constitutional deprivation.  To the extent that plaintiff contends that Supt. Lee knew of Lt. Ferrier, Capt. Webbe, or DSP Colao's alleged constitutional deprivation through his request for a discretionary review, and failed to remedy the wrong, such claim must fail. First, it is well-settled that absent a subordinate's underlying constitutional violation, there can be no supervisory liability.  See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see also Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").  Thus, as the undersigned has recommended dismissal of plaintiff's First Amendment retaliation claim, plaintiff's supervisory liability claim against Supt. Lee must also fail.

Second, even if the undersigned had determined that there was an underlying constitutional deprivation, courts in this Circuit are split as to "whether an allegation that a defendant affirmed a disciplinary proceeding determination is sufficient to establish personal liability for supervisory officials." Jean-Laurent v. Lane, No. 9:11-CV-00186 (NAM/TWD), 2016 WL 4775742, at *28 (N.D.N.Y. 2016).  This Court in Jean-Laurent held that the Northern District follows the "affirmance-plus standard," which "holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly suggest personal involvement."  Id. (quoting Scott v. Frederick, No. 13-CV-605 (TJM), 2015 WL 127864, at *17 (N.D.N.Y. Jan. 8, 2015)) (internal quotation marks omitted).  By its definition, a discretionary review

> is not a full appeal of the hearing disposition in its entirety, or of the finding of guilty, itself (and does not require, or trigger a review of the hearing or hearing disposition in its entirety, the conduct of a hearing or of the finding of guilty) but rather is simply

26

> a request that the Superintendent exercise discretion to reduce
> the actual penalty imposed given the charges the inmate was
> found guilty of violating.

Lee Decl. ¶ 10. Supt. Lee's memorandum in response to plaintiff's request states, "I have

reviewed the penalty imposed and find it appropriate. Your request for a modification is

denied." Dkt. No. 78-7 at 5. Thus, as Supt. Lee's affirmance of the November 2014

disciplinary hearing acts as a "mere rubber-stamp[ ]" of DSP Colao's disposition, it does not

amount to his personal involvement. See Jean-Laurent, 2016 WL 4775742, at *28.

Accordingly, it is recommended that defendants' motion on this ground be granted.


### 4. Retaliatory Transfer

To the extent that plaintiff contends that defendants transferred him from Eastern in

retaliation for his FOIA request, the undersigned finds that this claim is meritless. Plaintiff has

not proffered evidence establishing that Supt. Lee, DSP Colao, Capt. Webbe, or Lt. Ferrier

were personally involved in the decision to transfer plaintiff from Eastern, or otherwise had the

authority to effectuate such transfer; in fact, the record establishes the opposite. Supt. Lee,

DSP Colao, Capt. Webbe, and Lt. Ferrier all declare that they do not have the authority to

transfer inmates between facilities. See Colao Decl. ¶ 53 ("I have no authority over plaintiff's

transfers between facilities within the DOCCS prison system, and I did not participate in any

decision to transfer plaintiff from any one DOCCS facility to another, or in the act of so

transferring him."); Lee Decl. ¶ 45 ("I have no authority over plaintiff's transfers between

facilities within the DOCCS prison system, and I did not participate in any decision to transfer

plaintiff from any one DOCCS facility to another."); Webbe Decl. ¶ 41 (same); Ferrier Decl. ¶ 38 (same). Plaintiff's conclusory allegations suggesting that it was "common knowledge" he would be transferred after receiving a sentence of more than sixty days in SHU is not supported by evidence. See Dkt. No. 85-5 at 33; see also Simmons, 987 F. Supp. 2d at 307. Accordingly, it is recommended that defendants' motion on this ground be granted.

## C. Qualified Immunity

Defendants argue that, even if plaintiff's First Amendment claim is substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 14-15. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights

were clearly established at the time of the alleged violation.  Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test.  See subsection II.B supra, at 12-28.  Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation.  See Aiken, 236 F. Supp. 2d at 230.  Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. Eleventh Amendment

Defendants argue that they are entitled to Eleventh Amendment immunity relating to plaintiff's claims for money damages against them in their official capacities.  Def. Mem. of Law at 15-17.  The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states.

See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. Farid v. Smith, 850 F.2d 917, 921 (2d Cir. 1988) (citing Edelman v. Jordan, 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Here, because plaintiff seeks monetary damages against defendants for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. Federal Defendant's Motion for Summary Judgment

The FBI moves for summary judgment on the basis that (1) after a two reasonable searches and two direct inquiries, the FBI was unable to locate a technical manual for pipe bombs; and (2) if the FBI had located such a manual, it should not be released to an inmate for security reasons, and is protected from disclosure pursuant to FOIA's "law enforcement exception." Dkt. No. 75-10 at 4.

### A. Legal Standard for Motion for Summary Judgment under FOIA

In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its

> search was adequate and that any withheld documents fall within
> an exemption to the FOIA. Affidavits or declarations supplying
> facts indicating that the agency has conducted a thorough search
> and giving reasonably detailed explanations why any withheld
> documents fall within an exemption are sufficient to sustain the
> agency's burden. Affidavits submitted by an agency are
> accorded a presumption of good faith; accordingly, discovery
> relating to the agency's search and the exemptions it claims for
> withholding records generally is unnecessary if the agency's
> submissions are adequate on their face. When this is the case,
> the district court may forgo discovery and award summary
> judgment on the basis of affidavits.

Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994) (internal quotation marks,

footnote, and citations omitted).


### B. Adequacy of the FBI Search

"In response to a request for records under FOIA, agencies are required to conduct a

search 'reasonably designed to identify and locate responsive documents' but need not 'take

extraordinary measures to find the requested records.'" Kuzma v. United States Dep't of

Justice, No. 12-CV-807S, 2014 WL 4829315, at *3 (W.D.N.Y. Sept. 29, 2014) (quoting

Kennedy v. United States Dep't of Justice, No. 03-CV-6077, 2004 WL 2284691, at *2

(W.D.N.Y. Oct. 8, 2004)). In support of their argument that the search for the manual was

adequate, the FBI proffers a declaration from non-party Section Chief of the

Records/Information Dissemination Section ("RIDS"), Records Management Division David

M. Hardy. See Dkt. No. 75-1 ("Hardy Decl."). Mr. Hardy is familiar with the FBI's procedures

in responding to requests for information, as well as plaintiff's specific request pertaining to

the "Explosive Train Technical Manual." Id. ¶ 3. The FBI's recordkeeping system is known as

the Central Records System ("CRS"), which consists of "applicant, investigative, intelligence, personnel, administrative, and general rules compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions[.]" Id. ¶ 13. The CRS is subdivided into designated subject categories, including counterterrorism, intelligence, and criminal conduct and investigations conducted by the FBI. Id. ¶ 14. When a case file is opened, it is assigned a Universal Case File Number ("UCFN"). Id. Within each case file, documents are "serialized" and assigned a document number in chronological order. Id. The index to the CRS is known as the "general indices." Id. ¶ 15. A Universal Index ("UNI") is used to search the nearly 116.1 million searchable records contained in the Automated Case Support system – "an electronic, integrated case management system that converted over 105 million CRS records into a consolidated case management system accessible by all FBI officers. Id. ¶¶ 17, 18. In 2012, the FBI employed a next generation case management system called Sentinel, which is a web-based interface that includes the same automated application as the Automated Case Support system. Id. ¶ 19. Sentinel did not replace the Automated Case Support system; instead, information indexed into Sentinel is replicated into the Automated Case Support system. Id.

Mr. Hardy declares that after receiving plaintiff's initial FOIA request in June 2014, RIDS searched the Automated Case Support system via the UNI application for the search terms "Explosive Train Technical Manual," "Explosive Train Manual," and "Explosive Technical Manual," but the searches failed to locate records responsive to plaintiff's request. Dkt. No. 75-1 ¶ 20. The format of plaintiff's FOIA request did not mirror the manner in which FBI

32

investigative records are indexed — i.e., the subject matter of the request was not a named individual or a common investigation subject like the "Oklahoma City Bombing." Id. ¶ 21. Therefore, the FBI determined that in order to locate records responsive to plaintiff's FOIA request, it would need to conduct searches outside of the Automated Case Support system. Id. RIDS contacted the FBI Office of the General Counsel's ("OGC") Science and Technology Law Unit ("STLU"), who provided RIDS with a contact in the Critical Incident Response Group ("CIRG"). Id. ¶¶ 22. CIRG oversees the Hazardous Device School at Redstone Arsenal, and is "the FBI office most likely to possess/have knowledge concerning FBI records relating to an 'Explosive Train Technical Manual.'" Id. On September 18, 2014, the Hazardous Device School informed RIDS that no responsive records had been found. Id. ¶ 23.[11] The FBI therein informed plaintiff that they were unable to locate records in response to his request. Id.

After plaintiff commenced this lawsuit on October 7, 2016, RIDS conducted an additional search of the Automated Case System via the UNI, and added Sentinel, searching "Explosive Train Technical Manual," Explosive Train Manual," and "Explosive Technical Manual." Id. ¶ 24. The second search failed to return records responsive to plaintiff's FOIA request. Id. On August 3, 2017, RIDS reached out to an attorney from OGC who was a point of contact for CIRG. Id. ¶ 25. The OGC attorney contacted the director of the Hazardous Device School to determine whether the school had records responsive to plaintiff's request. Id. The director informed the attorney that "no records or manual existed matching the

---

[11] At the time of plaintiff's request the Hazardous Device School was jointly operated by the United States Army Training and Doctrine Command, which acted as custodians over the curriculum taught at the school. Dkt. No. 75-1 ¶ 23.

description of plaintiff's request," and that "any techniques, tactics, or procedures regarding FBI explosive training would be law enforcement sensitive and any disclosure of such information would seriously undermine law enforcement efforts to defeat improvised explosive devices, enabling criminals to circumvent the law." Id.

In his opposition, plaintiff concedes that the FBI "conducted a reasonable search for records, as required by FOIA[,] . . . and that they were unable to locate any records" responsive to his request. Dkt. No. 85-3 ¶ 53 (internal quotation marks omitted). However, he seems to suggest that the October 7, 2014 FOIA request – which was duplicative of the June 9, 2014 request – was directed to the United States Army, not the FBI, and that the United States Army's failure to respond to plaintiff's request violated federal statutory law. Id. ¶¶ 60-62. Although plaintiff is correct that at the time he sent his FOIA request the FBI and the United States Army jointly operated Hazardous Device School, he does not offer case law supporting a conclusion that the United States Army was required to respond to his request if the FBI had previously responded to an identical request for information that proffered no results. See Dkt. No. 75-1 ¶ 23. Moreover, plaintiff's October 7, 2014 FOIA request does not indicate that it is to the attention of the United States Army or otherwise reference the United States Army. Rather, the October 7, 2014 letter is addressed to "Special Agent in Charge, Gray Rd. Bldg. 3623, Redstone Arsenal, Alabama 35898." See Dkt. No. 78-13.

Accordingly, the undersigned finds that the two document searches and two personal inquiries made by the FBI constitute a reasonable search to locate documents responsive to plaintiff's request. See Code v. F.B.I., No. 95-1892 (RMU), 1997 WL 150070, at * 4 (D. D.C.

34

Mar. 26, 1997) (concluding that the FBI's search effort outlined in the supplemental declaration was adequate where the FBI's diligent code search indicate the requested documents did not exist or had been destroyed).

## C. FOIA Exemptions

Defendants argue that even if a technical manual for pipe bombs did exist, such manual would be exempt from disclosure pursuant to FOIA's "law enforcement exception." Dkt. No. 75-10 at 13. "Exemptions in the FOIA are to be 'narrowly construed since disclosure, not secrecy, is the dominant objective of the Act.'" Kuzma, 2014 WL 4829315, at *4 (quoting Kennedy, 2004 WL 2284691, at *2). Nevertheless, if a responsive record falls within an applicable exemption, disclosure is not required. See id. (citing FLRA v. United States Dep't of Veterans Affairs, 958 F.2d 503, 508 (2d Cir. 1992)). The "law enforcement exception" states, in its pertinent part, that

> "records or information compiled for law enforcement purposes" do not need to be disclosed if they "(E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual."

Dkt. No. 75-10 at 13 (quoting 5 U.S.C. § 552(b)(7)(E), (F). The FBI argues that "a technical manual for pipe bombs, if it existed, would undoubtedly reveal 'techniques and procedures for law enforcement'" and "could easily be shared with inmates throughout the prison and beyond." Id. The undersigned agrees. Although the Court is unable to review such document,

as it does not exist, plaintiff contends that he requested it in an attempt to gain information into "the explosive train, or squeeze shot, test" that was used by New York State Police Officers trained at the Hazardous Device School.  See Am. Compl. ¶ 28.  This information would undoubtedly be compiled in connection the FBI's efforts to train New York State Police Officers in the disarming of pipe bombs.  Moreover, as defendants – both the FBI and the DOCCS officials – aver, the presence of a manual regarding pipe bombs in a correctional facility could threaten the institutional safety of the prison, and, "could reasonably be expected to endanger the life or physical safety" of inmates or prison officials.  5 U.S.C. § 552(b)(7)(F); see Hardy Decl. ¶ 25 ("The director of [the Hazardous Device School states] that any techniques, tactics, or procedures regarding FBI explosive training would be law enforcement sensitive and any disclosure of such information would seriously undermine law enforcement efforts to defeat improvised explosive devices, enabling criminals to circumvent the law."); Lee Decl. ¶ 28; ("Ensuring that inmates do not possess weapons, or materials that would show them how to create or use weapons (including explosives), is of vital importance, is a part of the core mission at DOCCS[,] and plays an important role in helping to make DOCCS facilities safe, secure and orderly, for staff, visitors to the facility and the inmates themselves."); Ferrier Decl. ¶ 24 ("The type of material/information plaintiff sought . . . could well pose a threat to the safety and security of the facility and those within it . . . [as] [s]uch information could [ ] be used to make a pipe bomb that was especially difficult to disarm, or make a pipe bomb specially rigged to explode[.]"); Webbe Decl. ¶ 26 (same); Colao Decl. ¶ 41 (same).  Thus, if a technical manual for pipe bombs existed, it would be exempt pursuant to "the law

enforcement exception."

Accordingly, it is recommended that the FBI's motion for summary judgment is granted.

## IV. Request for Counsel

Plaintiff also requests appointment of counsel.  Dkt. No. 84.  Plaintiff has previously requested counsel on October 7, 2016 and February 10, 2017, and those requests were denied.  See Dkt. Nos. 4, 11, 32, 41.  It is well settled that "[a] party has no constitutionally guaranteed right to the assistance of counsel in a civil case."  Leftridge v. Connecticut State Trooper Officer No. 1283, 640 F.3d 62, 68 (2d Cir. 2011) (citations omitted).  In Terminate Control Corp. v. Horowitz, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit reiterated the factors that a court must consider in ruling upon such a motion.  In deciding whether to appoint counsel, the court should first determine whether the indigent's position seems likely to be of substance.  If the claim meets this threshold requirement, the court should then consider a number of other factors in making its determination. 28 F.3d at 1341 (quoting Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986)); see also Leftridge v. Connecticut State Trooper Officer No. 1283, 640 F.3d at 69 (noting that a motion for appointment of counsel may be properly denied if the court "concludes that [the party's] chances of success are highly dubious" (citations omitted)). The factors to be considered in deciding whether or not to assign counsel include the following:

> 1. Whether the plaintiff's claims seem likely to be of substance;
>
> 2. Whether the plaintiff is able to investigate the crucial facts concerning his claim;

3. Whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder;

4. Whether the legal issues involved are complex; and

5. Whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination.

Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir.1997); see also Hodge v. Police Officers, 802 F.2d 58 (2d Cir.1986). In light of the undersigned's present recommendation, this motion is denied without prejudice at this time. However, in the event this recommendation is not adopted, plaintiff is free to renew his request for appointment of counsel.


## V. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that the DOCCS defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 78) be **GRANTED**; and it is further

**RECOMMENDED**, that the FBI's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 75) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's amended complaint (Dkt. No. 47) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that plaintiff's Motion for Appointment of Counsel (Dkt. No. 84) is **DENIED**, without prejudice to renew at a later time, should the District Judge disagree with the undersigned's recommendation and conclude that any portion of plaintiff's case should

38

proceed to trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[12]

Dated: July 3, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[12] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).